13‐4022
Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex‐Exploración Y Producción

 UNITED STATES COURT OF APPEALS

 FOR THE SECOND CIRCUIT

 August Term, 2014

 (Argued: November 20, 2014      Decided: August 2, 2016)

 Docket No. 13‐4022

‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐x

Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V.,

 Petitioner‐Appellee,

 ‐ v.‐

Pemex‐Exploración Y Producción,

 Respondent‐Appellant.

‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐ ‐x

 Before: WINTER, JACOBS, and RAGGI, Circuit Judges.

 Respondent‐appellant Pemex‐Exploración Y Producción (“PEP”) appeals

from the judgment of the United States District Court for the Southern District of

New York (Hellerstein, J.) confirming an arbitral award notwithstanding that the
award was nullified by a court in Mexico, where the award was rendered.  We

conclude that:

 (1)  There is personal jurisdiction over PEP, and venue lies in the Southern

 District of New York;

 (2)  The district court did not abuse its discretion in confirming the award;

 and;

 (3)  The district court, which included in its judgment $106 million in

 performance bonds that PEP collected, did not thus exceed its authority.

Accordingly, we affirm the judgment of the district court in all respects.

Judge Winter concurs in a separate opinion. 

 CATHERINE E. STETSON, HOGAN
 LOVELLS US LLP, Washington, D.C.;  on
 the brief:  Dennis H. Tracey, III, Ira M.
 Feinberg, Hagan C. Scotten & Erin M.
 Meyer, Hogan Lovells US LLP, New York,
 NY; Richard C. Lorenzo, Hogan Lovells US
 LLP, Miami, FL, for Appellant.

 PAUL D. CLEMENT (with Zachary D.
 Tripp & William R. Levi on the brief),
 BANCROFT PLLC, Washington, D.C.; also
 on the brief: Jeffrey S. Bucholtz & Brian
 Callanan, King & Spalding LLP,
 Washington, DC; Richard T. Marooney &
 Charles C. Correll, Jr., King & Spalding
 LLP, New York, NY, for Appellee.

 2
 Preet Bharara (with David S. Jones, Caleb 
 Hayes‐Deats & Emily E. Daughtry on the 
 brief), United States Attorney for the 
 Southern District of New York, for Amicus
 Curiae United States of America; also
 on the brief: Joyce Branda, Douglas N. 
 Letter & Sharon Swingle, Civil Division, 
 Department of Justice, Washington, D.C.; 
 Mary E. McLeod, Department of State, 
 Washington, D.C.

 Erik S. Jaffe, Erik S. Jaffe, P.C., Washington, 
            D.C., for Amicus Curiae The Government
            of the United Mexican States in support of
            Respondent‐Appellant.

            Peter B. Rutledge, Athens, GA, for Amicus
            Curiae The Chamber of Commerce of the
 United States of America in support of
 Petitioner‐Appellee; on the brief: Kathryn
 Comerford Todd & Tyler R. Green, 
 National Chamber Litigation Center, Inc.,
 Washington, D.C.

DENNIS JACOBS, Circuit Judge:

 The truly unusual procedural history of this case requires us to reconcile

two settled principles that militate in favor of opposite results:  a district court’s

discretion to confirm an arbitral award, and the comity owed to a foreign court’s

ruling on the validity of an arbitral award rendered in that country, here, Mexico. 

Petitioner‐appellee Corporación Mexicana De Mantenimiento Integral, S. De R.L.

 3
De C.V. (“COMMISA”) contracted with respondent‐appellant Pemex‐

Exploración Y Producción (“PEP”), a state‐owned enterprise, to build oil

platforms in the Gulf of Mexico.  The contracts provided that arbitration would

be the exclusive mechanism for dispute resolution.  When the parties’

relationship disintegrated, each side accused the other of breach.  COMMISA

initiated arbitration proceedings, prevailed, and in 2009 obtained an award of

approximately $300 million.  

 COMMISA then petitioned the United States District Court for the

Southern District of New York (Hellerstein, J.) (“Southern District”) for

confirmation of the award, which was done.  PEP appealed the district court’s

judgment to this Court (“First Appeal”) and simultaneously attacked the arbitral

award in the Mexican courts.  The Eleventh Collegiate Court in Mexico set aside

the arbitral award on the ground that PEP, as an entity deemed part of the

Mexican government, could not be forced to arbitrate.  Armed with that decision,

PEP moved in this Court to vacate the Southern District’s judgment and remand

the First Appeal in light of the Eleventh Collegiate Court’s decision.  We granted

that motion.  On remand, the Southern District conducted an evidentiary hearing,

adhered to its previous ruling, issued a new judgment confirming the arbitral

award, and thus set the stage for the present appeal.

 4
 We hold that the Southern District properly exercised its discretion in

confirming the award because giving effect to the subsequent nullification of the

award in Mexico would run counter to United States public policy and would (in

the operative phrasing) be “repugnant to fundamental notions of what is decent

and just” in this country.  We further conclude that PEP’s personal jurisdiction

and venue objections are without merit.  Finally, we hold that the Southern

District did not exceed its authority by including in its judgment $106 million

attributed to performance bonds that PEP collected.  The judgment is affirmed.

 BACKGROUND

 This protracted litigation, begun in 2004, has challenged the courts of two

countries.  We summarize here only those facts useful for understanding the

issues presented and our resolution of them.

 1.

 COMMISA is a Mexican subsidiary of KBR, Inc., a United States

construction and military‐contracting corporation.  PEP is one of four

subsidiaries of Petroleos Mexicanos (“PEMEX”), an oil and gas company acting

on behalf of the Mexican government.  PEMEX and PEP are public entities of the

Mexican government, but have the capacity to independently own property and

 5
carry out business under their own names.  Together, PEMEX and its subsidiaries

“comprise the state oil and gas company of . . . Mexico.”  Joint Appendix (“J.A.”)

at 1515.

  In 1997, COMMISA and PEP contracted for COMMISA to build oil

platforms in the Gulf of Mexico.  The contract, governed by Mexican law,

contained the following arbitration clause:

 23.3    Arbitration.  Any controversy, claim, difference, or
 dispute that may arise from or that is related to, or associated
 with, the present Contract or any instance of breach with the
 present Contract, shall be definitively settled through
 arbitration conducted in Mexico City, D.F., in accordance with
 the Conciliation and Arbitration Regulations of the
 International Chamber of Commerce that are in effect at that
 time.  The arbitrators shall be three in number, and the
 language in which the arbitration shall be conducted shall be
 Spanish.

J.A. at 93.  PEP’s (now disputed) authority to bind itself to arbitration was

premised on the following provision of the “PEMEX and Affiliates Organic

Law”:

 In the event of international legal acts, Petróleos Mexicanos or its
 Affiliates may agree upon the application of foreign law, the
 jurisdiction of foreign courts in trade matters, and execute arbitration
 agreements whenever deemed appropriate in furtherance of their
 purpose. 
 
Special Appendix (“SPA”) at 41.

 6
 Two other provisions of the contracts bear on this appeal.  One clause gave

PEP the unilateral right to “Administrative Rescission” if COMMISA breached

the contract or abandoned its work; another clause required COMMISA to post

performance bonds.  

 2.

 Difficulties arose, in part over PEP’s insistence that the platforms be fully

constructed before being put into place in the Gulf of Mexico, something

COMMISA considered impractical given the weight of the completed platforms. 

Logistics and cost issues abounded, prompting the parties to execute a new

contract in May 2003.  The 2003 contract contained virtually‐identical arbitration

and administrative rescission clauses. 

 The 2003 contract failed to resolve the parties’ differences, and the conflict

reached climax in March 2004 when PEP, alleging that COMMISA had failed to

meet contractual milestones and had abandoned the project, gave notice of its

intent to administratively rescind the contract.  PEP seized the platforms, which

were 94 percent complete; ejected COMMISA from the work sites; and gave

notice by letter of its intention to administratively rescind the contracts.  After a

fruitless conciliation effort, COMMISA filed a demand for arbitration with the

 7
International Chamber of Commerce in December 2004.  When PEP informed

COMMISA two weeks later that it was indeed effecting administrative rescission,

COMMISA filed an amparo action in the District Court on Administrative Matters

for the Federal District (“Mexican District Court”) challenging the

constitutionality, appropriateness, and timeliness of PEP’s administrative

rescission1; COMMISA lost on all counts. 

 During the pendency of the amparo action, arbitration proceedings began in

Mexico City in May 2005, with the active participation of both parties.   

 In November 2006, the arbitration panel issued its Preliminary Award,

finding that it possessed jurisdiction over the dispute and enjoining PEP from

attempting to collect on the performance bonds until the issuance of a final

arbitral award authorizing collection.  Prior to the issuance of the Preliminary

Award, PEP’s arguments did not include a contention that its administrative

rescission was an act of authority not subject to arbitration under Mexican law. 

     1 An amparo action is a mechanism available to litigants in Mexico challenging
the validity or constitutionality of governmental acts; the sole remedy is a
declaration that the challenged governmental action is invalid. 

 8
 3.

 Two developments in Mexican law transpired while arbitration

proceedings were ongoing.  In December 2007, the Mexican Congress changed

the available forum for claims that (like COMMISA’s) raise issues related to

public contracts, and vested exclusive jurisdiction for such disputes in the Tax

and Administrative Court.  Not incidentally, the switch curtailed the applicable

statute of limitations: previously, ten years for suits in the Mexican District

Courts; afterward, for suits in the Tax and Administrative Court, 45 days. 

 Second, in May 2009, the Mexican Congress enacted Section 98 of the Law

of Public Works and Related Services  (“Section 98”), which ended arbitration for

certain claims (such as those by COMMISA):  

 An arbitration agreement may be executed regarding the disputes
 arising between the parties related to the construction of contractual
 clauses or related to issues arising from the performance of the
 contracts . . . The administrative rescission, early termination of the
 contracts and such cases as the Regulation of this Law may
 determine may not be subject to arbitration proceedings. 

J.A. at 3758.  

 9
 4.

 Promptly after the issuance of the Preliminary Award in November 2006‐‐

and before the enactment of Section 98‐‐PEP asked the arbitration tribunal to

reconsider its Preliminary Award and‐‐for the first time‐‐contended that

administrative rescission was categorically exempt from arbitration as an act of

authority on behalf of the Mexican government.  The tribunal rejected this

argument in its December 2009 Final Award, and, in a voluminous decision,

found that PEP breached the contracts and awarded COMMISA approximately

$300 million in damages. 

 COMMISA raced to confirm the award in the Southern District, which

ruled in COMMISA’s favor in August 2010.  PEP appealed that judgment to this

Court in the First Appeal and simultaneously challenged the arbitral award in

Mexico by filing its own amparo action, which eventually made its way to the

Eleventh Collegiate Court, the analog of the United States Court of Appeals for

the District of Columbia Circuit.  In September 2011, the Eleventh Collegiate

Court held that PEP’s rescission was not arbitrable and ordered that the award be

annulled; its analysis repeatedly referenced the newly‐enacted Section 98. 

 10
 The First Appeal was still pending when the Eleventh Collegiate Court

rendered its decision.  Pressing its advantage, PEP successfully moved here for

vacatur and remand so that the Southern District could consider the effect of the

Eleventh Collegiate Court’s decision.  See Corporación Mexicana de

Mantenimiento Integral, S. De R.L. De C.V. v. Pemex Exploración Y Producción,

No. 10‐4656, 2012 WL 9346475, at *1 (2d Cir. Feb. 16, 2012).  

 On remand, the Southern District received further briefing and conducted

a three‐day evidentiary hearing chiefly focused on the meaning of applicable

Mexican legal provisions.  See Corporación Mexicana de Mantenimiento Integral,

S. De R.L. De C.V. v. Pemex Exploración Y Producción, 962 F. Supp. 2d 642, 644

(S.D.N.Y. 2013).  The parties presented dueling experts who disputed whether the

Eleventh Collegiate Court’s decision was consistent with the development of

Mexican law, and whether the 2007 change in the applicable statute of limitations

could apply retroactively to the instant dispute.  Ultimately, the Southern District

“decline[d] to defer to the Eleventh Collegiate Court’s ruling,” and again

“confirm[ed] the Award” on the ground that annulment of the award “violated

basic notions of justice in that it applied a law that was not in existence at the

time the parties’ contract was formed and left COMMISA without an apparent

 11
ability to litigate its claims.”  Id.  Specifically, the Southern District concluded

that the Eleventh Collegiate Court applied Section 98 retroactively “to favor a

state enterprise over a private party,” and that COMMISA would be left “without

a remedy” for its claims given the compressed statute of limitations for actions

instituted in the Tax and Administrative Court.  Id. at 659‐60. 

 PEP appeals from that judgment.

 DISCUSSION

 In reviewing a district court’s confirmation of an arbitral award, we

ordinarily review legal issues de novo and findings of fact for clear error.  See

Pike v. Freeman, 266 F.3d 78, 86 (2d Cir. 2001).  In this case, because the Southern

District’s holding necessarily encompassed its decision to deny comity to a

foreign judgment, the standard of review is modified: “[w]e review a district

court’s decision to extend or deny comity to a foreign proceeding for abuse of

discretion.”  Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d

Cir. 1999).  Accordingly, we review the Southern District’s denial of comity for

abuse of discretion, and we review underlying conclusions of law de novo and

the underlying findings of fact for clear error.  This approach is consistent with

our precedent in other contexts.  See Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454,

 12
464 (2d Cir. 2013) (“We review a district court’s grant of class certification for

abuse of discretion, and review the conclusions of law underlying that decision

de novo . . . although ‘we review for clear error the factual findings underlying

th[at] ruling.’” (alteration in original) (citations omitted) (quoting Teamsters

Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201 (2d Cir.

2008)).

 As to the remaining issues on appeal, we review the Southern District’s

conclusions of law de novo and findings of fact for clear error.  See, e.g., Gulf Ins.

Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (venue); Mario Valente

Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 36 (2d Cir.

2001) (personal jurisdiction).   

 I

 PEP raises two threshold objections challenging: (1) the Southern District’s

exercise of personal jurisdiction over PEP, and (2) the location of venue in that

district.  We consider personal jurisdiction first.

 “Because the requirement of personal jurisdiction represents first of all an

individual right, it can, like other such rights, be waived.”  Ins. Corp. of Ireland,

Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).  “The actions

 13
of the defendant may amount to a legal submission to the jurisdiction of the court

. . . .”  Id. at 704‐05.  Therefore, “[t]he requirement that a court have personal

jurisdiction is a due process right that may be waived either explicitly or

implicitly.”  Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d

Cir. 1998); see also City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133 (2d

Cir. 2011) (“Personal jurisdiction, unlike subject‐matter jurisdiction, can,

however, be purposely waived or inadvertently forfeited.”).  The term

“forfeiture” is more apt than “waiver” here because the issue is whether PEP has

lost its personal jurisdiction objection through its conduct.2  

 When the First Appeal was pending, PEP fully briefed its jurisdiction and

venue arguments.  But, once armed with the Eleventh Collegiate Court decision,

PEP moved this Court to vacate and remand to the Southern District for

reconsideration.  To state the obvious, PEP then believed that the Southern

District would reverse course.  Nowhere in that motion did PEP suggest that the

relief it sought by motion here and on remand in the Southern District might

     2 See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) (“The term
‘waiver’ is best reserved for a litigant’s intentional relinquishment of a known
right.  Where a litigant’s action or inaction is deemed to incur the consequence of
loss of a right, or, as here, a defense, the term ‘forfeiture’ is more appropriate.”).

 14
offend “traditional notions of fair play and substantial justice” or otherwise

implicate personal jurisdiction concerns.  Gucci America, Inc. v. Weixing Li, 768

F.3d 122, 134 (2d Cir. 2014) (quoting Int’l Shoe Co. v. State of Wash., Office of

Unemployment Compensation and Placement et al., 326 U.S. 310, 316 (1945)). 

Thus, PEP’s due process objections evidently disappeared when its prospects of

success were buoyed by the Eleventh Collegiate Court’s decision.  Because PEP

affirmatively and successfully sought relief from this Court remanding for a new

merits determination in the Southern District, it forfeited its argument that

personal jurisdiction is lacking.  PEP cannot now re‐contest personal jurisdiction

merely because it is dissatisfied with its tactical choice.3

 Our sister circuits have reached similar conclusions in other contexts.  See

Gerber v. Riordan, 649 F.3d 514, 519 (6th Cir. 2011) (“‘[T]he voluntary use of

     3 COMMISA did not make the forfeiture argument in its initial brief.  Rather,
at our direction, the parties submitted post‐argument letter briefs on the
forfeiture issue.  “Entertaining issues raised for the first time on appeal is
discretionary with the panel hearing the appeal.”  Greene v. United States, 13
F.3d 577, 586 (2d Cir. 1994).  The “general rule that an appellate court will not
consider an issue raised for the first time on appeal” “is not an absolute bar . . .
the general rule is disregarded when we think it necessary to remedy an obvious
injustice.”  Id.  Here, as explained in text, our consideration of the issue is
necessary to prevent PEP from reviving threshold arguments that are
incompatible with seeking merits‐based relief from this Court and the Southern
District.

 15
certain [district] court procedures’ serve[s] as ‘constructive consent to the

personal jurisdiction of the [district] court . . . .’” (alteration in original) (quoting

Ins. Corp. of Ireland, 456 U.S. at 704)); PaineWebber Inc. v. Chase Manhattan

Private Bank (Switzerland), 260 F.3d 453, 460‐61 (5th Cir. 2001) (“[W]hen ‘a party

seeks affirmative relief from a court, it normally submits itself to the jurisdiction

of the court with respect to the adjudication of claims arising from the same

subject matter.’”(quoting Bel‐Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435,

443 (3d Cir. 1999))); see also Hunger U.S. Special Hydraulics Cylinders Corp. v.

Hardie‐Tynes Mfg. Co., 203 F.3d 835 (Table), 2000 WL 147392, at *3 (10th Cir.

2000) (“After its lengthy participation in this litigation, [and] efforts to seek

affirmative relief . . . [defendant] may not pull its personal jurisdiction defense

‘out of the hat like a rabbit.’”(quoting Fed. Deposit Ins. Corp. v. Oaklawn

Apartments, 959 F.2d 170, 176 (10th Cir. 1992))). 

 Moreover, PEP’s personal jurisdiction argument has changed over time, so

that it is unclear whether the challenge that we find forfeited is one that was

actually raised in the first instance.  In the Southern District, PEP’s initial motion

to dismiss for lack of personal jurisdiction was premised on inadequate service of

process.  Due process concerns were nowhere to be found; indeed, PEP’s counsel

 16
emphasized the limited scope of the personal jurisdiction argument, conceding

that the well‐known minimum contacts test was inapplicable to PEP.4   It was not

until briefing was complete that PEP raised before the Southern District the due

process point it advances on appeal.5   

 Having sought additional proceedings addressed to the merits, both here

and in the Southern District, PEP may not now contest personal jurisdiction.  “To

waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff

a reasonable expectation that it will defend the suit on the merits or must cause

the court to go to some effort that would be wasted if personal jurisdiction is later

found lacking.”  Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of

Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010).

     4 See J.A. at 2006 (“Personal jurisdiction is effected by proper service, and our
position is there is no proper service.  The minimal contacts test has been
eliminated by the Second Circuit in this context.”).

     5 Although COMMISA did not initially argue forfeiture, see supra n.3, it did
argue that PEP waived its objection to personal jurisdiction by explicitly
conceding that the jurisdictional protections of the Due Process Clause do not
apply here.  We need not consider COMMISA’s waiver argument because we
conclude, in any event, that these jurisdictional protections do not apply to PEP,
see infra pp. 20‐22, which affirmatively claims that it is functionally the Mexican
government.

 17
 PEP contends that its motion for a remand to consider the Eleventh

Collegiate Court’s decision simply advanced a menu of options not limited to

vacatur and remand, and that this Court’s choice to remand cannot support a

finding of forfeiture.  This mischaracterizes PEP’s litigation position before this

Court on the First Appeal; PEP explicitly angled for a full vacatur and remand of

the case, and it downplayed other alternatives.  Rather than pursue the First

Appeal on grounds (inter alia) of personal jurisdiction and venue, PEP effectively

abandoned those arguments and pressed for a remand to consider intervening

precedent on which PEP thought it could win.6  That abandonment constitutes

forfeiture. 

  *   *   *

 In any event, PEP’s due process argument fails because PEP is a

corporation owned by a foreign sovereign.  The jurisdictional protections of the

     6 PEP, in its post‐argument letter brief, argues that its request was tantamount
to a request for a remand following an indicative ruling but concedes it chose not
to follow this path.  That choice had consequences; if PEP had moved for an
indicative ruling, and the Southern District had issued such a decision, this Court
could have “remand[ed] for further proceedings” but would “retain[] jurisdiction
unless [we] expressly dismisse[d] the appeal.”  FED. R. APP. P. 12.1(b) (emphasis
added).  That (or, for that matter, a remand pursuant to United States v. Jacobson,
15 F.3d 19, 22 (2d Cir. 1994)) is far afield from what PEP urged this Court to do,
which was a full vacatur and remand without qualification.    

 18
Due Process Clause do not apply to “foreign states and their instrumentalities”.

Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d

393, 399 (2d Cir. 2009).  The same conclusion does not follow for foreign

corporations; see Bensmiller v. E.I. Dupont de Nemours & Co., State of La., 47

F.3d 79, 81 (2d Cir. 1995) (“First, the court must determine if the state’s long‐arm

statute reaches the foreign corporation.  Second, if the statute does reach the

corporation, then the court must decide whether that exercise of jurisdiction

offends due process.”).  This distinction rests on the principle that due process

rights can only be exercised by persons,  see Frontera, 582 F.3d at 398, including

corporations, which are persons at law.  See Phillips v. Tobin, 548 F.2d 408, 411

(2d Cir. 1976).  The line between a foreign sovereign and a foreign corporation

can sometimes be indistinct, but our conclusion‐‐that PEP falls in the former

category‐‐is informed by First Nat’l City Bank v. Banco Para el Comercio Exterior

de Cuba, 462 U.S. 611 (1983) (“Bancec”).   

 Bancec established the presumption that “government instrumentalities

established as juridical entities distinct and independent from their sovereign

should normally be treated as such.”  Id. at 626‐27.  The presumption, however,

“may be overcome in certain circumstances,” as “where a corporate entity is so

 19
extensively controlled by its owner that a relationship of principal and agent is

created.”  Id. at 628‐29.  Although Bancec disclaimed a “mechanical formula for

determining the circumstances under which the normally separate juridical

status of a government instrumentality is to be disregarded,” the Court indicated

that a valid basis for “declin[ing] to adhere blindly to the corporate form” would

be “where doing so would cause . . . an injustice.”  Id. at 632‐33.  Thus Bancec

relied on “equitable principles” to disregard the corporate form and thereby

prevent the government of Cuba from hiding behind a juridical entity (to obtain

relief) without itself appearing, which would necessarily waive sovereign

immunity and force it to answer for a violation of international law.  Id. at 630. 

Although Bancec arose in a different context, it is “applicable when the question

is whether the instrumentality should have due process rights to which the state

is not entitled.”  Frontera, 582 F.3d at 400. 

 This is one of the easy cases because PEP affirmatively claims that it is

functionally the Mexican government‐‐which it advances as the reason it cannot

be forced to arbitrate.  The Eleventh Collegiate Court opinion reinforces that

 20
view.7  Applying “recognized equitable principles,” PEP should be treated for

personal jurisdiction purposes as the foreign sovereign it claims to be when it

comes to other issues in this litigation.  Bancec, 462 U.S. at 633.  In Mexico, oil is a

state‐owned resource, and PEP’s actions sought to protect Mexican oil interests

from a foreign private corporation; bluntly put, PEP acted as the state.  That is the

basis of the following argument by PEP that nullification of the arbitral award

should be upheld: “the view that public entities can abrogate contracts for reasons

unavailable to private parties is hardly alien to American law.  For example, the

U.S. Government can block breach‐of‐contract suits against it by asserting that the

litigation would reveal state secrets.”  Appellant’s Br. at 53 (emphasis added). 

PEP’s assertion (in arguing the merits) that it is integral to the Mexican

     7 See J.A. at 3749 (“[S]uch administrative rescission of the public works
contract . . . involves the supervision of the resources of the State and society for
the purposes of meeting the needs of the latter.”); id. at 3750 (“[P]ublic powers
that aim at safeguarding the public benefit and interest cannot” be waived); id.
(“This is supported by the fact that the jurisdictional function exercised to set
aside acts of authority is an exclusive function of the State and can only be
delegated to its bodies.  However, acting in the capacity as state body entails
pursuing, with its own will, public interests.  This is evidently not done by
private parties when they submit their disputes to arbitrators, for in those cases
they are solely pursuing private objectives.”); id. at 3754 (“[A]ppellant acted in its
capacity as public entity and authority in a superior‐to‐subordinate
relationship.”).   

 21
government binds it for all portions of this appeal, including personal

jurisdiction. 

 The authorities on which PEP relies fail to persuade.  In GSS Group Ltd. v.

National Port Authority, 680 F.3d 805, 814 (D.C. Cir. 2012), the D.C. Circuit

recited the principle that the “presumption of separateness gives way only if a

foreign ‘corporate entity is so extensively controlled by its owner that a

relationship of principal and agent is created,’ or when ‘broader equitable

principle[s]’ dictate that separate treatment ‘would work fraud or injustice.’”

(citations omitted) (quoting Bancec, 462 U.S. at 629).  The court applied the

presumption of separateness: the National Port Authority of Liberia claimed to

be an independent juridical entity, and the court observed that the opposing

party “failed to contest that characterization.”  Id. at 817.  The court therefore had

no occasion to consider when a foreign corporation should be treated as its owner‐

sovereign.  First Investment Corporation of Marshall Islands v. Fujian Mawei

Shipbuilding, Limited, 703 F.3d 742, 755 (5th Cir. 2012) likewise notes that

manipulation of the corporate form “to perpetrate a fraud or injustice” warrants

overcoming the presumption of separateness. In any event, treating PEP as

separate from the Mexican government for the purpose of personal jurisdiction

 22
would work an “injustice” insofar as it would allow PEP to characterize its status

vis a vís the Mexican government in whatever way is advantageous to its several

arguments.  See Bancec, 462 U.S. at 633.

 II

 This panel is unanimous in concluding that venue lies in the Southern

District of New York.  But we differ as to which rationale is strongest.  

 The view of two of the panel members is that, for essentially the same

reasons that PEP forfeited its challenge to personal jurisdiction, it has a fortiori

forfeited its challenge to venue, because venue is “a limitation designed for the

convenience of litigants, and, as such, may be waived by them.”  Olberding v. Ill.

Cent. R.R. Co., 346 U.S. 338, 340 (1953).  An objection to venue “may be lost . . . by

submission through conduct.  Whether such surrender of a personal immunity be

conceived negatively as a waiver or positively as a consent to be sued, is merely

an expression of literary preference.  The essence of the matter is that courts affix

to conduct consequences as to place of suit consistent with the policy behind

[venue statutes] which is ‘to save defendants from inconveniences to which they

might be subjected if they could be compelled to answer in any district, or

wherever found.’”  Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168

 23
(1939) (citation omitted) (quoting General Inv. Co. v. Lake Shore & M.S. Ry. Co.,

260 U.S. 261, 275 (1922)).  PEP cannot now reject this forum as extraordinarily

inconvenient when it affirmatively sought relief from this Court and from the

Southern District of New York.8

 III 

 The domestic enforcement of foreign arbitral awards is governed by two

international Conventions: the Inter‐American Convention on International

     8  The concurring opinion argues that forfeiture is limited to “conduct that
deliberately avoids a final disposition of personal jurisdiction and venue issues
until a loss on the merits appears likely,” i.e. sandbagging.  Concurring Op. At 2. 
PEP’s conduct fits the bill: it sought full reconsideration of the merits in the
Southern District after the venue and personal jurisdiction issues were fully
briefed before this Court, then asserted its personal jurisdiction and venue
defenses after losing on the merits in the Southern District.

         The concurring opinion contends that PEP’s motion to remand was not
gamesmanship; however, in light of PEP’s entire course of conduct, we see it
distinctly otherwise.  Further, the sole relief sought by PEP in its motion to
remand was reconsideration of the result; PEP’s motion argued against holding
the appeal in abeyance as impractical given the changed circumstances of the
litigation.

         Finally, there is a basic and serviceable difference between a Jacobson
remand (which elicits an answer to a question that may assist resolution of the
pending appeal) and an ordinary remand (which allows reconsideration of the
outcome).  Our remand was of a second kind, notwithstanding that any further
appeal was directed to the same panel.  See, e.g., United States v. Rivalta, 925
F.2d 596, 597 (2d Cir. 1991).

 24
Commercial Arbitration (“Panama Convention”) and the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (“New York

Convention”).  There is no substantive difference between the two9: both evince a

“pro‐enforcement bias.”  Yusuf Ahmed Alghanim & Sons v. Toys “R” Us, Inc.,

126 F.3d 15, 20 (2d Cir. 1997).  The Federal Arbitration Act (“FAA”) expressly

incorporates the terms of the Panama Convention.  See 9 U.S.C. § 301 (“The Inter‐

American Convention on International Commercial Arbitration of January 30,

1975, shall be enforced in United States courts in accordance with this

chapter.”).10

     9  See Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc., 23 F.3d
41, 45 (2d Cir. 1994) (“The legislative history of the Inter‐American Convention’s
implementing statute, however, clearly demonstrates that Congress intended the
Inter‐American Convention to reach the same results as those reached under the
New York Convention: ‘The New York Convention and the Inter‐American
Convention are intended to achieve the same results . . . in view of . . . the parallel
legislation under the Federal Arbitration Act that would be applied to the
Conventions, [it is expected] that courts in the United States would achieve a
general uniformity of results under the two conventions.’”(quoting H.R. Rep. No.
501, 101st Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 675, 678)).

     10 The Panama Convention applies to this case since a “majority of the parties
to the arbitration agreement are citizens of . . . States that have ratified or acceded
to the [Panama Convention] and are member States of the Organization of
American States.”  9 U.S.C. § 305(1).

 25
 Article V of the Panama Convention sets out‐‐and limits‐‐the discretion of

courts in enforcing foreign arbitral awards: “The recognition and execution of the

decision may be refused, at the request of the party against which it is made, only

if such party is able to prove to the competent authority of the State in which

recognition and execution are requested” one of seven defenses.  Panama

Convention art. V(1), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (emphasis

added). “Article V provides the exclusive grounds for refusing confirmation

under the Convention, [and] one of those exclusive grounds is where ‘t[he]

award . . . has been [annulled] or suspended by a competent authority of the

country in which, or under the law of which, that award was made.’”  Yusuf, 126

F.3d at 20 (quoting Panama Convention art. V(1)(e), Jan. 30, 1975, O.A.S.T.S. No.

42, 1438 U.N.T.S. 245); see also 9 U.S.C. § 207 (“The court shall confirm the award

unless it finds one of the grounds for refusal or deferral of recognition or

enforcement of the award specified in the said Convention.”).  In sum, a district

court must enforce an arbitral award rendered abroad unless a litigant satisfies

one of the seven enumerated defenses; if one of the defenses is established, the

district court may choose to refuse recognition of the award.

 26
 At first look, the plain text of the Panama Convention seems to

contemplate the unfettered discretion of a district court to enforce an arbitral

award annulled in the awarding jurisdiction.  However, discretion is constrained

by the prudential concern of international comity, which remains vital

notwithstanding that it is not expressly codified in the Panama Convention.  See

Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir.

1997) (“Although courts in this country have long recognized the principles of

international comity and have advocated them in order to promote cooperation

and reciprocity with foreign lands, comity remains a rule of ‘practice,

convenience, and expediency,’ rather than of law.”(quoting Somportex Ltd. v.

Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971))); In re Maxwell

Comm’n Corp. plc, 93 F.3d 1036, 1047 (2d Cir. 1996) (“When construing a statute,

the doctrine of international comity is best understood as a guide where the

issues to be resolved are entangled in international relations.”).  

 Accordingly, “a final judgment obtained through sound procedures in a

foreign country is generally conclusive . . . unless . . . enforcement of the judgment

would offend the public policy of the state in which enforcement is sought.” 

Ackermann v. Levine, 788 F.2d 830, 837 (2d Cir. 1986) (emphasis in original).  “A

 27
judgment is unenforceable as against public policy to the extent that it is

‘repugnant to fundamental notions of what is decent and just in the State where

enforcement is sought.’” Id. at 841 (quoting Tahan v. Hodgson, 662 F.2d 862, 864

(D.C. Cir. 1981)); see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int’l

B.V., 809 F.3d 737, 743 (2d Cir. 2016) (“Nevertheless, ‘courts will not extend

comity to foreign proceedings when doing so would be contrary to the policies or

prejudicial to the interests of the United States.’”(quoting Pravin, 109 F.3d at

854)). 

 The public policy exception does not swallow the rule: “[t]he standard is

high, and infrequently met”; “a judgment that ‘tends clearly’ to undermine the

public interest, the public confidence in the administration of the law, or security

for individual rights of personal liberty or of private property is against public

policy.”  Ackermann, 788 F.2d at 841 (quoting Somportex, 453 F.2d at 443).  The

exception accommodates uneasily two competing (and equally important)

principles: [i] “the goals of comity and res judicata that underlie the doctrine of

recognition and enforcement of foreign judgments” and [ii] “fairness to litigants.” 

Id. at 842.

 28
 Precedent is sparse; but the few cases that are factually analogous have

endorsed this approach.  See Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd., 191

F.3d 194, 197 n.3 (2d Cir. 1999) (“Recognition of the Nigerian [annulment of the

arbitral award] in this case does not conflict with United States public policy.”);

see also TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 938 (D.C. Cir. 2007)

(“Baker Marine is consistent with the view that when a competent foreign court

has nullified a foreign arbitration award, United States courts should not go

behind that decision absent extraordinary circumstances not present in this case

. . . . Therefore, it is unsurprising that the courts have carefully limited the

occasions when a foreign judgment is ignored on grounds of public policy.  A

judgment is unenforceable as against public policy to the extent that it is

‘repugnant to fundamental notions of what is decent and just in the State where

enforcement is sought.’” (citation omitted) (quoting Ackermann, 788 F.2d at

841)).

 Consequently, although the Panama Convention affords discretion in

enforcing a foreign arbitral award that has been annulled in the awarding

jurisdiction, and thereby advances the Convention’s pro‐enforcement aim, the

exercise of that discretion here is appropriate only to vindicate “fundamental

 29
notions of what is decent and just” in the United States.  Id. (quoting Ackermann,

788 F.2d at 841).

 IV

 Applying this standard, we conclude that the Southern District did not

abuse its discretion in confirming the arbitral award notwithstanding

invalidation of the award in the Mexican courts.  The high hurdle of the public

policy exception is surmounted here by four powerful considerations: (1) the

vindication of contractual undertakings and the waiver of sovereign immunity;

(2) the repugnancy of retroactive legislation that disrupts contractual

expectations; (3) the need to ensure legal claims find a forum; and (4) the

prohibition against government expropriation without compensation.

1.  Contractual Waivers of Sovereign Immunity

 The “Pemex and Affiliates Organic Law” specifically authorized PEP to

agree to execute arbitration agreements, as it did in both the 1997 and 2003

contracts; the arbitration clauses likewise constrained COMMISA to arbitrate as

the sole recourse for challenging any breach.  When arbitration proceedings were

underway, PEP participated without contending that its act of administrative 

 30
rescission was beyond the reach of arbitration; that argument was advanced only

after PEP’s loss was presaged by issuance of the Preliminary Award.  

 That valid waivers must be enforced is settled domestic law.  The Supreme

Court has blessed contractual waivers of sovereign immunity and accompanying

agreements to arbitrate.  See C&L Enters., Inc. v. Citizen Band Potawatomi Indian

Tribe of Okla., 532 U.S. 411, 418‐23 (2001) (“We are satisfied that the Tribe in this

case has waived, with the requisite clarity, immunity from the suit . . . . brought

to enforce [the] arbitration award . . . [t]he Tribe clearly consented to arbitration

and to the enforcement of arbitral awards . . . the Tribe thereby waived its

sovereign immunity from . . . suit.”); Cooke v. United States, 91 U.S. 389, 398

(1875) (“If [the United States] comes down from its position of sovereignty, and

enters the domain of commerce, it submits itself to the same laws that govern

individuals there.”).11

 These values are not local.  The North American Free Trade Agreement

(“NAFTA”), ratified by Mexico and the United States, treats arbitration as a

     11 The Restatement of Foreign Relations Law also espouses this view.  See
Restatement (Third) of the Foreign Relations Law of the United States § 456(2)
(1987)(“Under the law of the United States . . . an agreement to arbitrate is a
waiver of immunity from jurisdiction in . . . an action to enforce an arbitral award
rendered pursuant to the agreement.”).

 31
“mechanism for the settlement of investment disputes that assures both equal

treatment among investors of the Parties in accordance with the principle of

international reciprocity and due process before an impartial tribunal.”  NAFTA

art. 1115, Jan. 1, 1994. 

 Giving effect to PEP’s twelfth‐hour invocation of sovereign immunity

shatters COMMISA’s investment‐backed expectation in contracting, thereby

impairing one of the core aims of contract law.  See Hunt Constr. Grp., Inc. v.

Brennan Beer Gorman/Architects, P.C., 607 F.3d 10, 14 (2d Cir. 2010) (“[C]ontract

law . . . is designed to enforce parties’ contractual expectations . . . .”).

2.  Retroactive Application of Laws      

 Giving effect to the nullification would likewise impair the closely‐related

concept of avoiding retroactive application of laws.  The Mexican government’s

adoption of Section 98 was an abrupt departure from the “Pemex and Affiliates

Organic Law” as well as from the contracts signed by the parties; allowing

Section 98 to nullify COMMISA’s arbitral award would deprive COMMISA of its

contract rights through a retroactive change in law.

 Retroactive legislation that cancels existing contract rights is repugnant to

United States law.  That repugnance is “deeply rooted in [Supreme Court]

 32
jurisprudence, and embodies a legal doctrine centuries older than our Republic.” 

Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994).  “Elementary

considerations of fairness dictate that individuals should have an opportunity to

know what the law is and to conform their conduct accordingly; settled

expectations should not be lightly disrupted.”  Id.  Anti‐retroactivity is a

principle embedded in “several provisions” of the Constitution, including:

    ! The Ex Post Facto Clause’s ban on retroactive application of penal

 legislation;

    ! The proscription against states retroactively impairing the obligation

 of contracts;

    ! The prohibition on Bills of Attainder, stopping legislatures from

 “singling out disfavored  persons and meting out summary

 punishment for past conduct”; and

 ! The Due Process Clause, and corresponding rights to “fair notice”.

Id. at 266.  It is therefore understatement to observe that “[r]etroactivity is not

favored in the law.”  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988). 

As the Southern District recognized, “retroactive application of laws and the 

 33
unfairness associated with such application is at the center of the dispute before

me.”  Corporación Mexicana, 962 F. Supp. 2d at 659.

 Prior to the enactment of Section 98, PEP was authorized to arbitrate, did in

fact agree to do so, and actively participated in the arbitration proceedings.  The

effect of the ruling by the Eleventh Collegiate Court‐‐that acts of administrative

rescission are not arbitrable‐‐may well have been compelled by the legislature’s

enactment of Section 98.  But the effect of the ruling amounts to retroactive

application of that law.  True, the Eleventh Collegiate Court specifically stated it

was not retroactively applying Section 98, and we are in no position to pass upon

that court’s interpretation of Mexican law, or upon the sufficiency of its

precedent.  We are concerned here with the effect of Section 98 in these

circumstances and upon these parties.  And it is incontestable that the capacity of

PEP to arbitrate was established in prior law; that it was withdrawn with respect

to certain disputes that had already arisen; and that it was withdrawn in a way

that frustrated contractual expectation, undid an arbitral award, and precluded

redress by COMMISA in any forum.  The sequence of events and the

circumstances in which Section 98 was enacted thus resulted in a retroactive

application of Section 98 as a matter of United States law.  That PEP is part of the

government that promulgated the law does not help at all.  

 34
 PEP argues that the Eleventh Collegiate Court’s decision followed from a

1994 Mexican Supreme Court decision, and that COMMISA was thus on notice

prior to 2009 that administrative rescissions were not arbitrable.  Whether the

Eleventh Collegiate Court properly reasoned from the 1994 precedent is

emphatically not for U.S. courts to say.  But notice is germane to the issue of

enforcement.  It therefore matters that the word “arbitration” does not appear in

the 1994 decision, which simply declares that administrative rescission is an act

of authority.  One of PEP’s own witnesses, in the evidentiary hearing before the

Southern District, testified that the 1994 decision was a “weak premise” for the

Eleventh Collegiate Court to rely upon, considering the number of other cases

going the other way.  J.A. at 3072‐73.  It is therefore unsurprising that the opinion

of the Eleventh Collegiate Court relies heavily on Section 98 and very little on the

Mexican Supreme Court decision.12 

     12 See J.A. at 3758‐63 (“This criterion is strengthened by the fact that, due to the
amendments of the current law of Public Works and Related Services, Section 98
states as follows . . . . The express prohibition that the administrative rescission or
the early termination of this type of contract cannot be subject to arbitration is
present in the second paragraph of this legal provision . . . it is evident that the
current trend of the legislator regarding public works is to protect the economy
and public expenditure by abandoning the practices that were aimed at granting
more participation to private parties than to the State.  Therefore, the State should
be granted, once again, suitable mechanisms to fulfill those objectives . . . if, as in

 35
3.  Availability of a Forum

 If the Southern District had recognized and implemented the nullification

of the arbitral award, COMMISA would have had no sure forum in which to

bring its contract claims.  The imperative of having cases heard‐‐somewhere‐‐is

firmly embedded in legal doctrine:  

 ! The grant of a forum non conveniens motion that would otherwise

 be proper “would not be appropriate where the alternative forum

 does not permit litigation of the subject matter of the dispute.”  Piper

 Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981).  

 ! The general rule of mootness is relaxed for issues that are “capable of

 repetition, yet evading review” because otherwise parties would be

 left “without a chance of redress.”  S. Pac. Terminal Co. v. Interstate

 Commerce Comm’n, 219 U.S. 498, 515 (1911).  

 ! In federal habeas corpus cases, a state prisoner can overcome a

 procedural default stemming from state restrictions on direct appeal,

this case, a contract is subject to administrative rescission by a party acting in the
capacity as authority such act may not be tried, modified, avoided or altered by
an arbitration panel.  This would be contrary to public policy which is currently
particularly protected by the amendment of the law which expressly sets forth
such prohibition.”).  

 36
 given a showing of cause and prejudice to allow the prisoner “fair

 process” and “the opportunity to comply with the State’s procedures

 and obtain an adjudication on the merits of his claims.”  Martinez v.

 Ryan, 132 S.Ct. 1309, 1317 (2012).  

These examples spring from the same source: litigants with legal claims should

have an opportunity to bring those claims somewhere.

 Absent confirmation of the award, COMMISA would lose the opportunity

to bring its claims because of the change in Mexican law subjecting COMMISA’s

claims to the 45‐day statute of limitations in the Tax and Administrative Court.  It

is no conjecture that COMMISA’s suit would be dismissed as time‐barred; the

Tax and Administrative Court did precisely that.  See J.A. at 2870‐71.   

 The statute of limitations is not the only barrier COMMISA would face.  Its

claims were tossed by the Tax and Administrative Court on the additional

ground that, because COMMISA’s claims were presented in the Mexican District

Court, they were barred by res judicata.  See J.A. at 2872.  This also raises

equitable concerns.  After PEP rescinded, COMMISA instituted an amparo action

in the Mexican District Court, which the arbitral panel presumably could not

 37
adjudicate.13  COMMISA lost.  Later, after the promulgation of Section 98, when

COMMISA sought a ruling in the Tax and Administrative Court, that court

rejected COMMISA’s breach claims on the ground of res judicata, citing the

amparo action.  Since the arbitral award favorable to COMMISA was treated as a

legal nullity, COMMISA was thus twice the victim of unforseen changes in the

law.  Such a result offends basic domestic principles of claim preclusion.  See

Allen v. McCurry, 449 U.S. 90, 94 (1980) (“Under res judicata, a final judgment on

the merits of an action precludes the parties or their privies from relitigating

issues that were or could have been raised in that action.”) (emphasis added).   

 We agree with the Southern District that COMMISA’s inability to have its

breach claims heard magnifies the injustice.  See Corporación Mexicana, 962 F.

Supp. 2d at 659 (“[T]his unfairness was exacerbated by the fact that the Eleventh

Collegiate Court’s decision left COMMISA without a remedy to litigate the

merits of the dispute that the arbitrators had resolved in COMMISA’s favor.”).

     13 See J.A. at 1486 (“COMMISA sought to stop PEP from administratively
rescinding the Contracts pursuant to public law provisions, the subject matter of
which cannot be brought before this Arbitral Tribunal’s Jurisdiction.”).

 38
4.  Government Expropriation Without Compensation 

 PEP, acting on behalf of the Mexican government, rescinded the contracts

and forcibly removed COMMISA from the project sites.  Then, by legislation,

Mexico frustrated relief that had been granted to COMMISA in the arbitral forum

and consigned it to a forum in which relief was foreclosed both by the statute of

limitations and res judicata.  The Eleventh Collegiate Court did no more than

apply this Mexican law.  At the same time, the enforcement of such Mexican law

amounted to a taking of private property without compensation for the benefit of

the government.  In the United States, this would be an unconstitutional taking. 

See Tahoe‐Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 535 U.S. 302,

321 (2002) (“When the government physically takes possession of an interest in

property for some public purpose, it has a categorical duty to compensate the

former owner, regardless of whether the interest that is taken constitutes an

entire parcel or merely a part thereof.” (citation omitted)).  This feature of United

States law is not peculiar to this country.  NAFTA provides that “[n]o party may

. . . take a measure tantamount to nationalization or expropriation of such an

investment (‘expropriation’), except . . . on payment of compensation in

accordance with paragraphs 2 through 6.”  NAFTA art. 1110, Jan. 1, 1994.  No

payment was made in accordance with NAFTA or otherwise.

 39
 *   *   *

 Any court should act with trepidation and reluctance in enforcing an

arbitral award that has been declared a nullity by the courts having jurisdiction

over the forum in which the award was rendered.  However, we do not think that

the Southern District second‐guessed the Eleventh Collegiate Court, which

appears only to have been implementing the law of Mexico.  Rather, the Southern

District exercised discretion, as allowed by treaty, to assess whether the

nullification of the award offends basic standards of justice in the United States. 

We hold that in the rare circumstances of this case, the Southern District did not

abuse its discretion by confirming the arbitral award at issue because to do

otherwise would undermine public confidence in laws and diminish rights of

personal liberty and property.  See Ackermann, 788 F.2d at 841.   Taken together,

these circumstances validate the exercise of discretion and justify affirmance.

 V

 Pursuant to the contracts, COMMISA posted $106 million in performance

bonds.  After entry of the Final Award in favor of COMMISA, PEP collected on

the bonds.  The Southern District’s judgment includes the $106 million.  PEP

argues that inclusion of that amount in the judgment exceeded the bounds of the

Southern District’s confirmation authority.  See 28 U.S.C. 1605(a)(6).  

 40
 “[T]he confirmation of an arbitration award is a summary proceeding that

merely makes what is already a final arbitration award a judgment of the court.” 

Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984).  The pertinent

question, then, is whether the performance bonds were part of the “final

arbitration award.”  Id.  

 The Preliminary Award ordered PEP to “refrain from filing any claim

attempting to collect the bonds granted in its favor . . . until the Tribunal issues its

final award, and according to such award, PEP has any right to claim the

payment of the bonds.”  J.A. at 143 (emphasis added).  The Final Award

concluded that PEP was “defeated in the merits” of the dispute, that PEP

engaged in “repeated breaches,” and that COMMISA’s success entitled it to

damages, litigation expenses, and costs.  Id. at 861‐68.  The Final Award also

emphasized the validity of the Preliminary Award, and its injunction against

collecting on the performance bonds: “[I]t must be reminded that in the

Preliminary Award it was determined that the Tribunal has jurisdiction to hear

. . . the application of conventional penalties through the collection on

performance bonds posted by claimant . . . . The aforementioned Preliminary

Award is binding and unalterable, as it is now final.”  Id. at 180.  

 41
 The conditions stated in the Preliminary Award for collection on the

performance bonds were the issuance of a final award (which happened), “and

according to such award, PEP has any right to claim the payment of the bonds”‐‐

a condition that was conspicuously unsatisfied.  Id. at 143 (emphasis added).  The

order enjoining PEP from collecting on the performance bonds was therefore part

of the Final Award itself.

 PEP argues that the omission of any reference to the performance bonds in

the damages section of the Final Award points the other way because the panel

enumerated the items that comprised the Award in painstaking‐‐and presumably

comprehensive‐‐detail.  This argument, however, ignores the sequence of events;

PEP relied on the Eleventh Collegiate Court decision as a judgment authorizing it

to collect on the performance bonds.  But that ruling was issued in October 2011‐‐

after the Final Award had already issued.  So there was no occasion for the Final

Award to specify damages stemming from conduct that had not yet occurred,

especially since PEP was forbidden from collecting on the bonds unless and until

the tribunal determined that PEP was entitled to do so. 

 Although the confirmation role is limited, we have still allowed district

courts to interpret the contents of applicable awards.  See Folkways Music

 42
Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993) (“In finding that the

award encompassed rights to the underlying works, the district court properly

interpreted the award.”).  The Southern District’s interpretation was sound; the

$106 million was properly included in the judgment.    

 CONCLUSION

 For the foregoing reasons, the judgment of the Southern District is

affirmed.

 43
 1 13-4022, Corporación Mexicana de Mantenimiento Integral, S. de
 2 R.L. de C.V. v. Pemex Exploración y Producción
 3
 4 WINTER, Circuit Judge, concurring:

 5 I concur in my colleagues’ disposition of this appeal while

 6 disagreeing with their imposing of a forfeiture with regard to

 7 personal jurisdiction and venue. I agree that PEP should be

 8 treated as a foreign sovereign for personal jurisdiction

 9 purposes, see Maj. Op. 18-23, and that personal jurisdiction over

10 PEP exists in the Southern District of New York. I also conclude

11 that venue is proper in the Southern District of New York under

12 28 U.S.C § 1391(f)(3) because PEP is an “agency or

13 instrumentality” of the State of Mexico and was “doing business”

14 in New York.

15 a) Forfeiture

16 My colleagues rule, sua sponte, that, “[b]ecause PEP

17 affirmatively and successfully sought relief from this Court

18 remanding for a new merits determination in the Southern

19 District, it forfeited its argument that personal jurisdiction is

20 lacking.” Maj. Op. 15. “[F]or essentially the same reasons[,] .

21 . . it has a fortiori forfeited its challenge to venue.” Maj.

22 Op. 23.

23 My colleagues rely principally on “gamesmanship” or

24 “sandbagging” cases, Hamilton v. Atlas Turner, Inc., 197 F.3d 58,

 1
 1 62 (2d Cir. 1999) (finding defendant forfeited personal

 2 jurisdiction defense by not moving to dismiss in order to “gamble

 3 it could raise the personal jurisdiction issue on the eve of

 4 trial, in case a trial occurred”), none of which lend their

 5 ruling any support whatsoever. The gamesmanship arises from the

 6 fact that defendants have an interest in obtaining a favorable

 7 ruling on the merits that would constitute res judicata. Pursuit

 8 of this interest creates an incentive on their part to preserve

 9 any existing personal jurisdiction and venue defenses but not

10 seek a definitive ruling -- which might lead only to a new

11 lawsuit elsewhere -- until a favorable merits ruling appears

12 unattainable. Courts have the opposite incentive. Why address

13 the merits at all if plaintiffs are in the wrong court?

14 Therefore, we have found forfeiture in conduct that deliberately

15 avoids a final disposition of personal jurisdiction and venue

16 issues until a loss on the merits appears likely.

17 No such gamesmanship occurred in this matter. Although the

18 grounds on which PEP challenged personal jurisdiction in the

19 district court changed over the course of the litigation, PEP

20 timely litigated that issue and the issue of proper venue in the

21 district court. In moving to dismiss the petition to confirm the

22 ICC’s arbitration award, PEP filed a motion to dismiss, arguing

23 that (i) the district court lacked personal jurisdiction, and

 2
 1 (ii) venue was improper under 28 U.S.C § 1391(f)(3) because PEP

 2 was not doing business in New York. An August 25, 2010 hearing

 3 thoroughly explored those issues. In confirming the ICC’s

 4 arbitration award, the district court expressly held that it had

 5 personal jurisdiction over PEP and that venue was proper in the

 6 Southern District of New York.

 7 On appeal, PEP’s brief extensively argued that “[t]he

 8 district Court [] erred in holding that it had personal

 9 jurisdiction over PEP,” Br. of Resp’t-Appellant at 19,

10 Corporación Mexicana de Mantenimiento Integral, S. de R.L. de

11 C.V. v. Pemex Exploración y Producción (“PEMEX”), No. 10-4656-cv,

12 2012 WL 9346475 (2d Cir. Feb. 16, 2012), and that it “erred in

13 holding that venue was proper in the SDNY,” id. at 22.

14 After briefing in this court, however, the Eleventh

15 Collegiate Court of Mexico rendered its decision invalidating the

16 ICC’s arbitration award. PEP understandably moved before this

17 panel for a remand to allow the district court to reconsider the

18 validity of the arbitration award in light of the Mexican ruling.

19 In so moving, PEP did not mention the personal jurisdiction and

20 venue issues, already fully briefed before this panel, because

21 there had been no intervening events casting light upon those

22 issues. However, PEP requested in the alternative that the

23 appeal be held in abeyance pending disposition of a Fed. R. Civ.

 3
 1 P. 60(b) motion, based on the Mexican court ruling, in the

 2 district court. Appearing as amicus curiae, the United States

 3 supported the motion to remand.

 4 The seeking of a remand was perfectly understandable. The

 5 intervening Mexican decision was of unquestioned relevance to

 6 this appeal, as the appearance of the United States as amicus

 7 curiae and Judge Jacobs’ opinion amply demonstrate. In all

 8 probability, had oral argument proceeded, we would have remanded

 9 to obtain the views of the district court as to the bearing of

10 the Mexican judicial ruling on the merits issues.

11 In light of the indisputable relevance of the Mexican

12 ruling, my colleagues’ forfeiture ruling is not only sua sponte,

13 but also unprecedented. We have ruled that courts should proceed

14 with “caution” in finding forfeiture of personal jurisdiction

15 defenses. Atlas, 197 F.3d at 60. Forfeiture is to be

16 principally found in cases of “sandbagging,” for example, where a

17 defendant “rais[es] the issue of personal jurisdiction on a

18 motion to dismiss, [then] deliberately refrain[s] from pursuing

19 it any further when his motion is denied in the hopes of

20 receiving a favorable disposition on the merits, and then

21 rais[es] the issue again on appeal only if he [is] unhappy with

22 the district court's ultimate decision.” Peterson v. Highland

23 Music, Inc., 140 F.3d 1313, 1318 (9th Cir. 1998). “Typically,

 4
 1 courts have found forfeiture only if the party waited years

 2 before moving or engaged in substantial pre-trial activity.”

 3 Infinity Consulting Grp., LLC v. Am. Cybersystems, Inc., 2010 WL

 4 2267470, *1-2 (E.D.N.Y. May 30, 2010); see also In re Helicopter

 5 Crash Near Wendle Creek, Brit. Columbia on Aug. 8, 2002, 485

 6 F.Supp.2d 47, 52 (D. Conn. 2007) (noting that “[i]n most cases

 7 where courts have found waiver, the defendant has waited multiple

 8 years after its answer to file a motion to dismiss”).

 9 More specifically, in most cases where we and other courts

10 have found forfeiture, defendants failed to bring up personal

11 jurisdiction or improper venue defenses in their answer, as

12 required by Fed. R. Evid. 12(h), or had moved for summary

13 judgment on the merits prior to moving to dismiss for lack of

14 personal jurisdiction or improper venue.1 In other cases, courts

15 have found forfeiture where the defendant defaulted and later

16 brought a personal jurisdiction defense,2 or where the defendant
 1
 See Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 (2d Cir. 1966) (ruling
 that the defendants had forfeited the privilege to object to improper venue when they
 did not make their objection until after the district court raised the issue sua
 sponte -- long after the defendants had originally filed their answer, which did not
 oppose venue); Thompson v. United States, 312 F.2d 516, 520 (10th Cir. 1962) (holding
 that defendant had waived any defense of improper venue when he made the argument only
 after filing a motion for summary judgment); Misch on Behalf of Estate of Misch v. Zee
 Enterprises, Inc., 879 F.2d 628, 631-32 (9th Cir. 1989) (noting that a defendant
 waives personal jurisdiction and improper venue defenses when he files for summary
 judgment prior to filing motions to dismiss for lack of personal jurisdiction or
 improper venue).
 2
 See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 115 (2d Cir. 2011)
 (finding defendants waived their personal jurisdiction defense when they initially
 “press[ed] that defense but then willfully withdr[ew] from the litigation and
 default[ed], even after being warned of the consequences of doing so”); Trustees of
 Cent. Laborers' Welfare Fund v. Lowery, 924 F.2d 731, 732-33 (7th Cir. 1991) (finding
 forfeiture after defendants moved to vacated default judgment entered against them six

 5
 1 began vigorously arguing personal jurisdiction or improper venue

 2 defenses only after participating in the litigation for a very

 3 long time.3 In no cases have courts found forfeiture in the

 4 circumstances present here -- where PEP timely and repeatedly

 5 sought dismissal of the action based on personal jurisdiction and

 6 improper venue defenses, failing to do so only in moving to

 7 remand -- or holding the appeal in abeyance -- for the district

 8 court’s consideration of the Mexican court decision rendered

 9 after briefing of the appeal in this court.

10 In fact, many courts have declined to find forfeiture where

11 defendants did not argue personal jurisdiction or improper venue

12 defenses at every possible stage of litigation, including cases

13 in which litigants were quite derelict in raising these defenses.

14 See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of

15 Oregon, Inc., 2016 WL 160721, at *4 (E.D.N.Y. Jan. 13, 2016)

16 (refusing to find forfeiture of personal jurisdiction defense

17 where defendant first made the defense in a motion to dismiss but

18 later failed to make the defense when the district court was

 years earlier); Robertson v. Dowbenko, 443 Fed.Appx. 659, 661-62 (2d Cir. 2011)
 (finding defendant forfeited personal jurisdiction defense by not complying with
 discovery orders resulting in default).
 3
 See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) (finding defendant
 forfeited personal jurisdiction defense by not moving to dismiss for four years after
 filing his answer and after “considerable pretrial activity [had] occurred”);
 Continental Bank, N.A. v. Meyer, 10 F.3d 1293, 1297 (7th Cir. 1993) (finding personal
 jurisdiction defense forfeited where defendants had “fully participated in litigation
 of the merits for over two-and-a-half years[, including participating in discovery,]
 without actively contesting personal jurisdiction”).

 6
 1 considering to dismiss the case on other grounds); In re

 2 Helicopter Crash Near Wendle Creek, Brit. Columbia, 485 F.Supp.2d

 3 at 51-52 (finding no forfeiture of personal jurisdiction defense

 4 where defendant pled the defense in its answer but waited four

 5 months to file a motion to dismiss); Phat Fashions, L.L.C. v.

 6 Phat Game Athletic Apparel, Inc., No. 00–cv–0201, 2001 WL

 7 1041990, *3–4 (S.D.N.Y. Sept. 7, 2001) (finding no forfeiture of

 8 personal jurisdiction defense -- even though defendant did not

 9 assert the defense until thirteen months after the complaint was

10 filed and the parties had completed discovery on substantive

11 claims -- because “[d]efendant's delay in bringing its motion

12 does not rise to the level of egregiousness that other courts

13 have found sufficient to constitute a forfeiture”); Infinity

14 Consulting Grp., LLC, 2010 WL 2267470, at *1-2 (finding no

15 forfeiture of personal jurisdiction defense even when defendants

16 waited nearly ten months before moving to dismiss on personal

17 jurisdiction grounds and eight months to answer the complaint);

18 Johnson v. Masselli, 2008 WL 111057, at *3 (N.D.Ind. Jan. 4,

19 2008) (ruling defendants did not waive objection to venue by

20 defending against temporary restraining order and participating

21 in hearings and discovery related to preliminary injunction

22 request where objection to venue was raised in responsive

23 pleading); Biro v. Condé Nast, 2014 WL 4851901, at *7 (S.D.N.Y.

 7
 1 Sept. 30, 2014) (no forfeiture where defendant filed a motion to

 2 dismiss “eleven months after filing her answer,” and, “[i]n the

 3 interim, the parties were engaging in jurisdictional discovery, a

 4 process that generated disputes as late as” one month before the

 5 motion was filed). I have found no case imposing forfeiture in

 6 circumstances like those before us -- the sole act of delay in

 7 pursuing personal jurisdiction and venue defenses being an

 8 alternative (to holding the appeal in abeyance) request for a

 9 remand on indisputably valid grounds -- much less doing so sua

10 sponte.

11 My colleagues muddy the waters by seeking to distinguish

12 this case from our well-established and routine practice of so-

13 called Jacobson remands. In typical Jacobson remands, we remand

14 partial jurisdiction to the district court to supplement the

15 record on a discrete factual or legal issue while retaining

16 jurisdiction over the original appeal. United States v.

17 Jacobson, 15 F.3d 19, 22 (2d Cir. 1994). Jacobson remands are

18 enormously helpful tools, see United States v. Salameh, 84 F.3d

19 47, 50 (2d Cir. 1996) (noting that Jacobson remands “eliminate[]

20 any question as to the district court's jurisdiction [over the

21 particular issue] and enables [the appellate] [c]ourt to provide,

22 if appropriate, for the automatic restoration of appellate

23 jurisdiction, without the need for a new notice of appeal”).

 8
 1 This rationale may be the result of my colleagues’ fear that

 2 future litigants will avoid or argue against Jacobson remands

 3 entirely, lest they risk forfeiting claims or defenses raised in

 4 their original briefs.

 5 My colleagues distinguish this matter from routine Jacobson

 6 remands on the ground that we retained no jurisdiction in our

 7 remand in this matter. Relying on the cession of partial or full

 8 jurisdiction for such a distinction is irrelevant, in my view. A

 9 request for a Jacobson remand may well be part of a factual

10 pattern justifying a forfeiture ruling.

11 In this matter, our remand order limited the issues to be

12 decided by the district court and directed that any subsequent

13 appeal be referred to this panel. The remand order confined the

14 district court to addressing the effect of the intervening

15 decision of the Eleventh Collegiate Court of Mexico on the

16 arbitrability issues. PEMEX, 2012 WL 9346475, at *1. In

17 remanding, we specifically stated we were “reach[ing] no other

18 issue,” and we ordered that “[a]ny subsequent appeal in th[e]

19 case should be referred to this panel.” Id.

20 In my innocence -- or lack of prescience -- I thought we

21 were ordering the reference of any subsequent appeal to this

22 panel in the interests of judicial economy because we had

23 familiarized ourselves with the issues other than arbitrability,

 9
 1 i.e. personal jurisdiction and venue. As a panel member voting

 2 in favor of the remand as justified in the interests of judicial

 3 economy, it never occurred to me that my colleagues viewed the

 4 limited remand as limiting the issues to be heard on the

 5 subsequent appeal. Had I realized such a limitation was

 6 contemplated, I would have dissented. It is of small comfort

 7 that my innocence and lack of prescience was shared by COMMISA,

 8 which never raised forfeiture in arguing the personal

 9 jurisdiction and venue issues on the second appeal. Rather, my

10 colleagues dispose of PEP’s proffer of an alternative to a full

11 vacatur and remand, i.e. retaining jurisdiction but holding the

12 appeal in abeyance pending disposition of a Rule 60(b) motion, is

13 disregarded because it was “downplayed” while PEP “angled” for a

14 full remand, subjective purposes not glaringly obvious to this

15 observer.

16 b) Venue

17 Because I agree with my colleagues on the merits of the

18 personal jurisdiction issue, I turn to the venue question.

19 Under FSIA, “[a] civil action against a[n] [agency or

20 instrumentality of a foreign state] . . . may be brought[] in any

21 judicial district in which the agency or instrumentality is

 10
 1 licensed to do business or is doing business . . . .” See 28

 2 U.S.C. § 1391(f)(3).4

 3 FSIA defines “agency or instrumentality of a foreign state”

 4 as “any entity” that is (1) “a separate legal person, corporate

 5 or otherwise,” (2) “an organ of [the] foreign state or political

 6 subdivision thereof, or a majority of whose shares or other

 7 ownership interest is owned by a foreign state or political

 8 subdivision thereof,” and (3) “neither a citizen of a State of

 9 the United States as defined in section 1332(c) and (e) of this

10 title, nor created under the laws of any third country.” 28

11 U.S.C. § 1603(b). That the first and third requirements are met

12 by PEP is not in dispute.

13 Regarding the second requirement, because PEP is owned by

14 PEMEX, PEP is not an entity whose majority ownership is held by a

15 foreign state. See Dole Food Co. v. Patrickson, 538 U.S. 468,

16 475-77 (2003) (entity whose ownership is separated by “one or

17 more corporate tiers” from foreign state does not fall within

18 majority ownership provision of 28 U.S.C. § 1603(b)(2)). So, the

19 question becomes whether PEP is an “organ” of the State of

20 Mexico. I believe that it is.

 4
 Title 28 U.S.C. § 1391(f)(3) states that “[a] civil action against a foreign state as
 defined in section 1603(a) of this title may be brought--in any judicial district in
 which the agency or instrumentality is licensed to do business or is doing business,
 if the action is brought against an agency or instrumentality of a foreign state as
 defined in section 1603(b) of this title.” Title 28 U.S.C. § 1603(a), in turn,
 defines a “foreign state” to “include . . . an agency or instrumentality of a foreign
 state as defined in [28 U.S.C. § 1603(b)].”

 11
 1 In Filler v. Hanvit Bank, we adopted a five factor test to

 2 determine whether a corporation is an “organ” of a foreign state:

 3 (1) whether the foreign state created the entity for a
 4 national purpose; (2) whether the foreign state
 5 actively supervises the entity; (3) whether the
 6 foreign state requires the hiring of public employees
 7 and pays their salaries; (4) whether the entity holds
 8 exclusive rights to some right in the [foreign]
 9 country; and (5) how the entity is treated under
10 foreign state law.
11
12 378 F.3d 213, 217 (2d Cir. 2004) (quoting Kelly v. Syria Shell

13 Petroleum Dev. B.V., 213 F.3d 841, 846–47 (5th Cir. 2000)); see

14 also USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 209 (3d Cir.

15 2003). “Filler invites . . . a balancing process, without

16 particular emphasis on any given factor and without requiring

17 that every factor weigh in favor of, or against, the entity

18 claiming FSIA immunity.” In re Terrorist Attacks on Sept. 11,

19 2001, 538 F.3d 71, 85 (2d Cir. 2008) (internal citation and

20 quotation marks omitted), abrogated on other grounds by Samantar

21 v. Yousuf, 560 U.S. 305 (2010); see also European Cmty. v. RJR

22 Nabisco, Inc., 764 F.3d 129 (2d Cir. 2014), rev’d on other

23 grounds by 136 S.Ct. 2090 (2016).

24 PEP easily satisfies factors (1), (2), (4), and (5), and may

25 satisfy (3) -- hiring public employees -- although the record is

26 unclear in this regard. First, PEP was created for a national

27 purpose. Since 1938, it has been “entrusted [] with the central

 12
 1 planning and management of Mexico’s petroleum industry.” J.

 2 App’x at 1526. Second, PEP is highly supervised by the State of

 3 Mexico. The Mexican government controls the annual budget of

 4 PEMEX -- which controls PEP -- and can “intervene directly . . .

 5 in [PEMEX and its subsidiaries] commercial and operational

 6 affairs.” Id. at 1523. Under PEMEX’s charter, the Mexican

 7 government appoints all members of PEMEX’s board of directors,

 8 with ten of the fifteen directors being representatives of the

 9 state and/or public officials. See RJR Nabisco, 764 F.3d at 145

10 (“We have said that a foreign state actively supervises an organ

11 when it appoints the organ's key officials and regulates some of

12 the activities the organ can undertake.”) Third, “Mexican law

13 gives [PEP] the exclusive right to exploit Mexico’s hydrocarbon

14 reserves.” Petróleos Mexicanos, Annual Report (Form 20-F) 23

15 (June 30, 2009). Fourth, Mexican law treats PEP as a government

16 entity, as starkly evidenced by the Eleventh Collegiate Court of

17 Mexico’s decision that PEP could not be forced to arbitrate

18 precisely because it is a part of the Mexican government. See

19 Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.,

20 476 F.3d 140, 143 (2d Cir. 2007) (finding the foreign state law

21 factor of Filler satisfied when the “Korean government informed

22 the State Department and the district court that it treats [the

23 entity] as a government entity”).

 13
 1 Under our caselaw, if PEP was so intertwined with the State

 2 of Mexico as to be deemed the state itself, Section 1391(f)(3)

 3 would be inapplicable. See 28 U.S.C.A. § 1391(f)(3) (applying

 4 only “if the action is brought against an agency or

 5 instrumentality of a foreign state”). In Garb v. Republic of

 6 Poland, we explained that, if the “core functions” of the legal

 7 entity “are predominantly governmental,” it is a “foreign state,”

 8 while if the “core functions” of the legal entity are

 9 “predominantly . . . commercial,” it is an “agency or

10 instrumentality of a foreign state.” 440 F.3d 579, 594 (2d Cir.

11 2006). In Garb, we held that the Ministry of the Treasury of

12 Poland is not an “agency or instrumentality” of the Polish state,

13 because the core functions of the Treasury are governmental. Its

14 roles included “hold[ing] and administer[ing] the property of the

15 Polish state,” and it also “represent[ed] the Polish State with

16 respect to financial claims brought against the State.” Id. at

17 594-95.

18 In contrast, PEP is clearly a commercial entity. It has no

19 regulatory functions. Cf. Servaas Inc. v. Rep. of Iraq, 2011 WL

20 454501, at *3 (2d Cir. Feb. 10, 2011) (finding the core function

21 of the Ministry of Industry of Iraq is governmental and not

22 commercial because, in part, it approves “applications for

23 trademark registration, a regulatory function that [is]

 14
 1 quintessentially governmental”). Its primary role is to find,

 2 develop, and sell oil and natural gas. This is an inherently

 3 commercial role. See NML Capital, Ltd. v. Rep. of Argentina, 892

 4 F.Supp.2d 530, 533 (S.D.N.Y. 2012) (finding an Argentinean

 5 natural gas company’s core functions were “predominantly

 6 commercial” -- despite its “function[ing] in accordance with the

 7 policies and goals of the Republic [of Argentina]” -- because its

 8 “primary function is to sell natural gas at low prices in

 9 Argentina”).

10 I note that my conclusion that PEP is an “agency or

11 instrumentality” of the State of Mexico is entirely consistent

12 with holding -- for personal jurisdiction purposes -- that PEP is

13 a “foreign sovereign” rather than merely a “foreign corporation”

14 under First Nat’l City Bank v. Banco Para el Commercio Exterior

15 de Cuba, 462 U.S. 611 (1983) (“Bancec”), a holding of my

16 colleagues that I join.

17 The core of the venue dispute, however, is whether PEP is

18 “doing business” in New York. This language suggests that some

19 substantial activity of a commercial nature be engaged in by the

20 defendant and that the activity be more than an isolated

21 instance. Significance and continuity must, therefore, be found.

22 Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.

23 2000). In the present matter, PEP has served as a guarantor for

 15
 1 thirty-five of PEMEX’s bond issuances in New York -- guaranteeing

 2 the payment of all principal and interest in the amount of $9.5

 3 billion -- and has served as the agent for service of process for

 4 each of those issuances. This significant, continuous course of

 5 commercial activity and presence in New York for litigation

 6 purposes easily satisfies the pertinent language of Section

 7 1391(f)(3).

 8 PEP argues, however, that “doing business” must be defined

 9 narrowly in light of a purported “settled” meaning given to those

10 words in the context of personal jurisdiction (but before the

11 decision Int’l Shoe Co. v. Wash., 326 U.S. 310 (1945)).

12 Similarly, PEP notes that, when Congress enacted FSIA in 1976, it

13 based Section 1391(f)(3) on 28 U.S.C. § 1391(c), which, at the

14 time, provided that “[a] corporation may be sued in any judicial

15 district in which it is incorporated or licensed to do business

16 or is doing business.” S. Rep. No. 94-1310, at 31 (1976); H.R.

17 Rep. No. 94-1487, at 32 (1976). PEP relies upon some non-FSIA

18 cases rendered under the old Section 1391(c) that “consistently

19 rejected efforts to rely on a company’s participation in the New

20 York financial markets in order to establish venue under” Section

21 1391(c). Br. of Appellant at 28.

22 Contrary to PEP’s suggestion, “doing business” for purposes

23 of Section 1391(c) was historically far from clearly defined.

 16
 1 See 14D Wright & Miller, Fed. Prac. & Proc. § 3811 n.16 (4th ed.)

 2 (“This aspect of the statute [the phrase “doing business”] proved

 3 the most difficult to construe.”); see also 1 William H. Manz,

 4 Foreign Sovereign Immunities Act of 1976 with Amendments: A

 5 Legislative History of Pub. L. No. 94-583, 48 (2000) (“[I]t is

 6 difficult to say where [instrumentalities] ‘reside’ under the

 7 corporate standards of ‘. . . doing business’ used in section

 8 1391(c).”). Indeed, “[t]here was never an exact formula under

 9 which the question of ‘doing business’ was decided,” although

10 “[m]ore than a single or casual transaction was required before

11 the corporation was regarded as doing business in the district

12 for federal venue purposes.” Wright & Miller, Fed. Prac. & Proc.

13 § 3811 n.16.

14 The language of the statute governs our interpretation. See

15 In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98, 112-

16 24 (2d Cir. 2016). I find no difficulty in holding that serving

17 as the guarantor of $9.5 billion raised in thirty-five bond

18 issuances and agreeing to be served process in New York regarding

19 enforcement of the guarantees is “doing business” in New York.

20 The quantum of business is significant, the number of

21 transactions easily supports a finding of continuity, and the

22 agreement to be served process in connection with this activity

 17
 1 nails down PEP’s presence in New York for purposes of Section

 2 1396.

 3 That conclusion is consistent with current caselaw. In

 4 Altmann v. Rep. of Austria, the Ninth Circuit held that an

 5 Austrian art gallery owned by the Austrian government was “doing

 6 business” in the Central District of California for venue

 7 purposes because the gallery’s publications and advertisements

 8 had been distributed in that District, even though the gallery

 9 did not directly publish the materials in California. 317 F.3d

10 954, 972 (9th Cir. 2002), opinion amended on denial of reh’g, 327

11 F.3d 1246 (9th Cir. 2003), and aff’d on other grounds, 541 U.S.

12 677 (2004). The Ninth Circuit suggested that “doing business,”

13 despite not being defined by FSIA, is essentially synonymous with

14 “commercial activity,” which is defined. See id. (noting with

15 evident agreement that the “district court [had] found ‘no

16 authority that suggests that a foreign agency or instrumentality

17 that engages in ‘commercial activity’ within a district is not

18 also ‘doing business' within a district’”) (quoting Altmann v.

19 Rep. of Austria, 142 F.Supp.2d 1187, 1215 (C.D. Cal. 2001)).

20 No decision seems to be in conflict with Altmann. Cf. Arch

21 Trading Corp. v. Rep. of Ecuador, 2015 WL 3443906, *4 (S.D.N.Y.

22 May 28, 2015) (providing little examination of § 1391(f)(3) but

23 finding an Ecuadoran state owned bank was not “doing business” in

 18
 1 the United States when it merely provided loans to Ecuadoran

 2 citizens who had been living abroad on their return to Ecuador);

 3 Ocean Faith Shipping Co., Ltd. v. Union of India Food Corp. of

 4 India, 1996 WL 227827, at *2 (E.D.La. May 3, 1996) (providing

 5 little examination of § 1391(f)(3) but finding that state owned

 6 grain shipper was not necessarily “doing business” in New Orleans

 7 simply because “the port of New Orleans exports more grain than

 8 any port in the world” -- a direct connection had to be shown);

 9 Shirobokova v. CSA Czech Airlines, Inc., 335 F.Supp.2d 989, 991

10 (D. Minn. 2004) (finding that code sharing arrangement between

11 airlines were insufficient to establish venue under the “doing

12 business” test in the absence of a physical presence in Minnesota

13 and airline operations in the state).

14 As the district court found, PEP engaged in “systematic,

15 deliberate corporate activity . . . to obtain funds for its

16 operational activities through its parent in New York, and [PEP

17 had] established a presence for the purpose of obtaining these

18 funds in New York.” Corporación Mexicana de Mantenimiento

19 Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción,

20 No. 10-cv-00206 (AKH), ECF No. 47, at *25 (S.D.N.Y. Aug. 26,

21 2010). Serving as a guarantor for thirty-five bond issuances and

22 agreeing to accept service of process for those issuances is a

23 substantial “commercial” activity.

 19
 1 Other precedent also supports my conclusion. For example,

 2 in Rep. of Argentina v. Weltover, Inc., the Supreme Court held

 3 that Argentina was engaged in “commercial activity” when it

 4 issued bonds in the United States. 504 U.S. 607, 609-14 (1992);

 5 see also Jackson v. People's Rep. of China, 550 F.Supp. 869, 873

 6 (D.Ala. 1982) (applying the commercial activity exception to

 7 bonds issued by China on the basis that “[i]t is clear that the

 8 sale, issuance for sale and authorization of issuance for sale in

 9 the United States constitutes a ‘commercial activity’”).

10 Likewise, in Mortimer Off Shore Servs., Ltd. v. Fed. Republic of

11 Germany, we concluded that the Federal Republic of Germany’s

12 assumption of liability for West German bonds issued in the

13 United States was “commercial activity” under FSIA. 615 F.3d 97,

14 107 (2d Cir. 2010).

15 c) Conclusion

16 I therefore concur in the result.

17

 20